# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| XIAOYAN TANG,<br><br>        Plaintiff,<br><br>v.<br><br>CITIZENS BANK (a/k/a CITIZENS BANK, N.A., a/k/a CITIZENS, N.A. a/k/a CITIZENS, a/k/a RBS CITIZENS, N.A.); RBS CITIZENS, N.A. THE ROYAL BANK OF SCOTLAND GROUP (a/k/a RBS); DAVID M. NACKLEY, and Does 1-10,<br><br>        Defendants. | Civil Action No.: 1:14-cv-12550 |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Citizens Bank, N.A., identified in the First Amended Complaint as "Citizens Bank (a/k/a Citizens Bank, N.A., a/k/a Citizens, N.A. a/k/a Citizens, a/k/a RBS Citizens, N.A.)," RBS Citizens, N.A., (collectively, "Citizens Defendants"), and David Nackley (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment.[1]

### INTRODUCTION

Plaintiff Xiaoyan "Ivy" Tang was a poor performer essentially throughout her four-year employment at Citizens Bank. That was the opinion not only of David Nackley, the sole

---

[1] The Complaint originally asserted twelve counts, nine of them common law claims, statutory claims for sexual harassment under Title VII (Count IX), Mass. Gen. L. c. 151B (Count XII), and a claim under Mass. Gen. L. c. 93A (Count VII). The Court granted Defendants' motion for partial judgment on the pleadings on October 21, 2014 (Docket No. 20), and as a result only the Title VII and Chapter 151B claims survive.

individual whom she accuses of sexual harassment, but of every supervisor who reviewed her work from at least 2009 until her employment ended in 2011.

Though her adjective-laden Complaint evades clear understanding, she appears to accuse Citizens and Nackley of gender discrimination in the form of a sexually hostile work environment. Despite two days of deposition, however, Tang's complaints rest on just a small number of passing comments, none of them sexual in nature. On the undisputed facts, she cannot meet the substantial requirements for proving a hostile environment under either state or federal law, and Citizens and Nackley are entitled to summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

### A. Tang Is Hired As A Portfolio Manager II In The Commercial Real Estate Group.

Plaintiff Xiaoyan "Ivy" Tang was hired by Citizens Bank as a Portfolio Manager II in the Commercial Real Estate Group in October 2007. (*See* Declaration of Joanne M. Guilbert, dated June 15, 2015, ("Guilbert Decl."), Exhibit ("Ex.") 1 (offer letter CIT0001).) Initially, Tang reported to Manager Daniel Ouellette. (*Id.*; Declaration of Mark W. Batten, Esq., dated June 15, 2015, Ex. A ("Tang Dep."), 106-107.) Sometime in or around 2008 or 2009, Ouellette left Citizens Bank and Tang started reporting to Manager Philip Wadleigh. (Tang Dep. 107-108.)

#### 1. Tang Receives An Unfavorable Performance Review from Philip Wadleigh for 2009.

In his review of Tang's performance for 2009, Wadleigh identified several areas where Tang could improve her performance. (Guilbert Decl. Ex. 2 (CIT0020-23).) He specifically noted that Tang needed to improve her ability to interact and communicate with Commercial Real Estate staff and clients, and provided her with a rating of 2 out of 5 or "Development

---

[2] The facts set forth herein are assumed to be true and undisputed for the purposes of this Motion for Summary Judgment only.

Required" in that particular skill area. (*Id.*) With regard to other skill areas, Wadleigh suggested that Tang improve her speed and efficiency, be more proactive in seeking out and completing her work, increase her ability to multitask, and improve her communications with the Relationship Managers whom she supported. (*Id.*) On a scale of 1 to 5, with 5 being the best performance rating, Wadleigh's ratings of Tang on individual components were 2's and 3's, for an average of less than 3. (*Id.*)[3] He ultimately "rounded up" her annual performance rating to a 3 or "Fully Achieved Objectives." (*Id.*; *see also* Guilbert Decl. Ex. 3 (CIT0918-19).)

**B. Following The Negative Review, Tang Seeks A Transfer To The Technology Banking Group.**

Within weeks of receiving Wadleigh's performance review, Tang sought a transfer within Citizens Bank to an open position in the Technology Banking Group. (Tang Dep. at 157-58.) In response to her request for the transfer, she received a phone call from Manager David Nackley, to whom she would report in the Technology Banking Group if she successfully transferred. (*Id.* at 159.) Nackley worked out of the Stamford, Connecticut office and came to Boston once every one to two weeks to oversee the Technology Banking Group staff based there. (*Id.* at 162, 248.)

**1. Tang and Nackley Meet To Discuss The Possible Transfer.**

Tang and Nackley arranged to meet at a restaurant in Faneuil Hall, which was close to Citizens Bank's offices in Boston where Tang worked, to discuss the possibility of Tang's transfer. (*Id.* at 160-61; Declaration of David Nackley, dated June 15 2015 ("Nackley Decl."), ¶ 9.) Tang brought work samples with her to the meeting, and Nackley told her that he would

---

[3] Tang maintained at her deposition in May 2015 that Defendants provided her with "fake" or "false" documents," including Wadleigh's review of her 2009 performance. (Tang Dep. at 129, 139.) She further suggested that she could not assess whether the documents Defendants produced, including Wadleigh's review, were authentic until she verified them against documents she possessed. (*Id.* at 119-20.) Defendants, however, had previously requested that Plaintiff produce all performance appraisals, reviews, evaluations and ratings that she has from Citizens Bank, and to date Plaintiff has not produced any such documents, despite multiple requests. (*See* Defendants' Memorandum In Support of Motion to Compel, Dkt. No. 60 at 4-5.)

review them. (Tang Dep. at 170-71.) Nackley was primarily interested in learning why Tang wanted to leave the Commercial Banking Group, which was faring relatively well in the aftermath of the financial crisis, and although he had some difficulty communicating with Tang due to her English skills, he understood that she had an interest in technology and technology companies. (Nackley Decl., ¶¶ 7-8.)

Tang alleges that during this meeting, she was upset by Nackley's comments. (Tang Dep. at 171.) Specifically, Tang alleged that Nackley told him about two au pairs who helped take care of his family, and the fact that they were both from Thailand. (*Id*. at 175, 184-85.) According to Tang's own allegations in her Complaint, she believes that "Thai culture has a very liberal attitude toward sex" and she somehow interpreted Nackley's remarks about his au pairs as meaning that she must "get with his mandated, in effect, program of sex." (*See* First Amended Complaint ("Compl."), Dkt. No. 1-1 at ¶¶ 20-21; Tang Dep. at 175.) Tang has repeatedly referred to Nackley's au pairs as his "Thai girls" or "Thai house girls." (Compl. ¶ 20; Tang Dep. at 171, 175, 180, 184, 186.)[4]

Tang also complained more generally that Nackley spoke about "Asian women," although she did not provide any specifics beyond Nackley's sharing that his family hosted au pairs who were originally from Thailand. (Tang Dep. at 173-175.) She has alleged that Nackley made remarks to the effect that "Asian women are obedient," but when asked for detail in her deposition, Tang replied that she could not "recall details," but that "in sense he say Asian women are obedient" when he spoke about his Thai au pairs by saying that they took care of his home and lived with his family. (*Id*. at 175.)

---

[4] Tang also alleges that Nackley made certain statements about the au pairs who worked in his home at some unspecified time during or after this meeting: (1) he remarked that the au pairs who worked with his family wore very modest bathing suits when they went to the pool, (Tang Dep. at 270-71), and (2) he mentioned that he had played a role in sponsoring them, for immigration purposes, to come to the U.S. and work as au pairs (*id*. at 218-20).

Finally Tang alleges that Nackley asked her if she was married and, when she said no, he said something about "where to find a boyfriend." (Tang Dep. at 176-80.) Once again, when asked to provide specific detail about what Nackley actually said and how she responded, Tang testified that she told Nackley that her dating life was her business, and that she could not recall how he responded to that. (*Id*.)[5]

Other than her own vague, spotty recollection regarding her subjective interpretation of Nackley's statements at the meeting in Faneuil Hall – none of which suggest that Nackley actually said anything sexual or discriminatory – Tang offers nothing to support her allegation that Nackley made inappropriate or harassing statements. Indeed, she admits that she did not mention the meeting or her alleged reaction to the meeting to anyone else, and she continued to pursue the transfer even after her meeting with Nackley in Faneuil Hall. (*Id*. at 191-94.)

### 2. Tang Continues To Pursue The Transfer.

Following her meeting with Nackley, with full knowledge that she would be reporting to him if she transferred to the Technology Banking Group, Tang continued to pursue to the intra-company transfer. (*Id*. at 193.) She exchanged emails with Nackley, none of which were alleged to be inappropriate or offensive, and proceeded to interview with several senior staff members in the Technology Banking Group. (*Id*. at 187-88.)

Wadleigh and Human Resources Business Partner Lori Eldridge expressed hesitation about the transfer due to Tang's poor performance in the Commercial Real Estate Group. (Guilbert Decl., Ex. 3 (CIT 0918-919).) Indeed, in an email to Eldridge notifying her of the potential transfer, Wadleigh wrote that Tang's performance grade was a possible obstacle to the

---

[5] It is notable that, according to Tang's sworn deposition testimony, at the time of this meeting she was dating Mark Akin, an executive at Invention Machine, a company that was a client of the Technology Banking Group. (Tang Dep. at 37-38.) This created the potential for a serious conflict of interest.

transfer, particularly because she had initially been rated as a "2" for 2009, and her performance rating was later rounded up to a "3." (*Id.*)

### C. Tang Transfers To The Technology Banking Group.

After some internal debate, Tang's requested transfer was ultimately approved. (Tang Dep. at 202-204.) It was viewed as an opportunity for Tang to get a "fresh start." (Guilbert Decl. Ex 4 (CIT1079-80).)

#### 1. Nackley Meets With Tang In July 2010 To Discuss Performance Goals.

Sometime in or around July 2010, Nackley met with Tang to discuss her performance goals for the upcoming year. (Tang Dep. at 213-14.) Indeed, as part of Citizens Bank's effort to make Tang's "fresh start" successful, they sought to provide her with clear performance goals and consistent feedback in the Technology Banking Group. (Guilbert Decl., Ex. 4 (CIT1079-80).)

During that meeting, which lasted less than 10 minutes, Nackley provided Tang with a list of performance goals for the 2010 performance year. (Guilbert Decl. Ex. 5 (CIT0010); Nackley Decl. ¶ 11.) In addition to the typed goals that were provided to all Portfolio Managers, Nackley handwrote additional goals and comments for Tang, including the goals that she (1) work independently; (2) improve communication, including that she not "assume" things and instead should ask questions; and (3) use Senior Portfolio Manager Jennifer Perry, who functioned as Tang's day-to-day supervisor in the Boston office, as an information resource. (Guilbert Decl. Ex. 5 (CIT0010).) According to Tang, Nackley broke the word "assume" down into "ass," "u" and "me," suggesting that Tang could avoid making incorrect assumptions by remembering that when she make assumptions without asking clarifying questions, she makes an

"ass" out of "[yo]u" and "me." (*Id.*; Tang Dep. at 221-25.) Tang interpreted Nackley's remarks as having a sexual meaning. (Tang Dep. at 221-25.)

During her deposition, Tang testified that, following this conversation, she believed that Nackley wanted to have a sexual relationship with her. (*Id.* at 258.) She also testified, however, that Nackley never said anything overtly sexual to her. (*Id.* at 259.) She simply concluded as much from her conversation with Nackley regarding the word "assume." (*Id.* at 258.)

### 2. Tang Sends Nackley A Holiday Card.

On December 24, 2010, Tang gave Nackley a holiday card saying, among other kind words, that "[i]t has been great being part of your team. Thank you for all your support!" (Guilbert Decl. Ex. 6 (CIT1083-84).) During her deposition, Tang refused to answer questions regarding whether her statements in the holiday card were honest or truthful. (Tang Dep. at 291-92.)

### 3. Tang Receives Her 2010 Annual Performance Evaluation.

Tang's performance continued to be poor, and Nackley and other staff members in the Technology Banking Group continued to provide Tang with constructive feedback and coaching, particularly with regard to her communication skills and ability to work independently. (*See*, *e.g.*, Guilbert Decl. Exs. 4, 7 – 13 (CIT1079-80; CIT0526; CIT0603-04; CIT645-46; CIT763-64; CIT0823; CIT924; CIT1059-60); Nackley Decl. ¶¶ 15-17.) In January 2011, Tang received her 2010 performance evaluation, which provided her with an overall annual rating of 2 out of 5, or "Development Required." (Guilbert Decl. Ex. 14 (CIT0028-30).) Nackley identified several areas in which Tang needed to improve, including her ability to work independently and her communication skills. (*Id.*) Tang wrote in the "employee comments" section of her review that she "appreciate[d] the constructive advice with respect to [her] performance" and that she "look[ed] forward to utilizing it in the coming year." (*Id.*)

On January 31 and February 4, after receiving her review, Tang emailed Nackley to tell him that she wished to improve her performance and that she hoped he could "continue to trust" in her. (Guilbert Decl. Exs. 15 & 16 (CIT0334 and CIT0292).)

### 4. Tang Is Placed On A Performance Improvement Plan ("PIP").

As a follow up to the 2010 performance review, Nackley worked with Citizens Bank's Employee Relations Service Center ("ERSC") to draft a Performance Improvement Plan ("PIP") for Tang, which was delivered to Tang on or around February 8, 2011. (Guilbert Decl. Ex. 17 (CIT0031-32).) Around the same time, Perry told Nackley that Tang had disclosed to her that she was or had been dating Mark Akin, a top management executive of a company that was one of Relationship Manager Will Clossey's clients. (Tang Dep. at 354-61; Nackley Decl., ¶ 20.) Because the Technology Banking Group was responsible for evaluating the creditworthiness of certain businesses applying for financing at Citizens Bank, this created a potentially serious conflict of interest. (Tang Dep. at 360-61; Guilbert Decl. Exs. 18 & 19 (CIT0473 and CIT1010-11); Nackley Dep., ¶¶ 20, 23.)

Accordingly, during his February 8 meeting with Tang to address her performance shortcomings, Nackley also sought to address the potential conflict of interest. (Guilbert Decl. Ex. 19 (CIT1010-11).) When the conversation turned to the possible conflict of interest, a Human Resources Business Partner joined the meeting via telephone. (*Id.* at 356-57.) Tang said very little during this meeting and did not appear outwardly emotional, but she testified that she was "so scared," and felt "mentally totally like crushed" by the meeting. (Tang Dep. at 355-56; Nackley Decl., ¶ 24.) Tang does not allege that Nackley made any sexual or discriminatory remarks during this meeting. (*Id.* at 354-61.)

### 5. Following Her Placement On A PIP, Tang Alleges Discrimination And Requests Another Transfer.

Tang refused to sign the PIP during the February 8 meeting. (Tang Dep. at 362-63.) On February 14, 2011, she returned the PIP with a handwritten note reading: "I disagree with the Performance Improvement Plan. I felt the plan is the result of discriminatory treatment based on my race, gender, and national origin." (Guilbert Decl. Ex. 17 (CIT0031-32).) Her note did not mention sexual harassment. (*Id*.) On the same day, Tang also called ERSC to reiterate the same allegations. (Tang Dep. at 364.) That day, February 14, 2011, approximately one week after she was placed on a PIP, marked the first time that Tang had complained about any inappropriate or discriminatory treatment by anyone at Citizens Bank.

After complaining to ERSC, Tang was promptly contacted by ERSC Consultant Breeda Cosgrove. (*Id*. at 368.) In response to Cosgrove's request for more information about Tang's concerns, Tang provided her with a letter dated February 27, 2011. (Guilbert Decl. Ex. 20 (CIT0012-13).) For the first time, Tang complained that Nackley's "present performance review" was "itself evidence of discrimination" because it followed "inappropriate words to [her]," specially Nackley's "dwell[ing]" on "the word 'assume,' emphasizing that it could be broken down into 'ass,' 'you(u)' and 'me.'" (*Id*.) In her letter, Tang once again requested a transfer within the bank. (*Id*.) This marked the second time that Tang requested an internal transfer following a negative performance review.

### 6. After Conducting An Investigation – With Which Tang Refused To Cooperate – Citizens Finds Her Allegations To Be Unsubstantiated.

After receiving Tang's February 27 letter, Cosgrove contacted Tang to request a meeting to discuss her allegations. (Tang Dep. at 379-380.) Tang refused to meet with Cosgrove, and insisted that all communications remain in writing. (*Id*.; Guilbert Decl. Ex. 21 (CIT0179-80).) Cosgrove informed Tang that an in-person meeting was a necessary component of her

investigation, and that if Tang would not meet with her, then she would have to proceed with the investigation without the benefit of Tang's input. (Guilbert Decl. Ex. 22 (CIT0081-82).) Tang continued to refuse to meet with her. (Tang Dep. at 381.)

Cosgrove conducted a full investigation into Tang's allegations of race, gender, and national origin discrimination, which included interviews with Tang's colleagues. (Guilbert Decl. Ex. 23 (CIT0042).) Ultimately, Tang's allegations were determined to be unsubstantiated. (*Id*.) In addition, Cosgrove reviewed the documentation of Tang's performance issues, and found Tang's performance reviews to be justified by her work product and feedback from her supervisors. (*Id*.) In or around late March or early April 2011, Cosgrove advised Tang that the case was closed as unsubstantiated, but that the case could be reopened if Tang wished to participate in the investigation and provide additional information. (*Id*.)

### 7. Tang's Performance Continues To Fall Short, And She Is Placed On A Final Written Warning ("FWW").

Following her placement on the PIP on February 8, 2011, Tang's performance did not improve and she continued to make material errors, despite continuous coaching. (*See*, *e.g.*, Guilbert Decl. Exs. 24 – 29 (CIT0235-36; CIT0285; CIT0786; CIT0474-76; CIT0548; CIT1006-07); Nackley Decl. ¶ 24.) In the words of one Senior Vice President who worked directly with Tang, it was "par for the course" for Tang to "at least partially ignore [his] basic advice and directions. When asked as to why, she either says she's been too busy or gives an unclear excuse." (Guilbert Decl. Ex. 26 (CIT0786).)

In early May, Tang made mistakes in a debt service analysis that she was preparing for one of Clossey's clients. (Guilbert Decl. Ex. 31 (CIT0862-65).) Clossey spoke with her about the mistakes and explained how to prepare an accurate analysis. (*Id*.) Tang indicated that she understood and that she would correct the model. (*Id*.) Several days later, Tang provided Clossey

with work product that contained the same mistakes. (*Id.*) Clossey asked to meet with Tang on May 12 to discuss the work product. (*Id.*) He again went over the appropriate way to prepare the analysis. (*Id.*) Tang told Clossey that she felt that he was incorrect about how to do the analysis. (*Id.*) In response to Tang's mistaken understanding of the analysis, Clossey asked her if she had taken the bank's credit training program. (*Id.*) Tang became extremely upset in response to Clossey's inquiry. (*Id.*) She raised her voice, told Clossey that he was "very mean" and said that she had been told she did not need credit training. (*Id.*) At her deposition, Tang reiterated that she believed that Clossey was "very mean." (Tang Dep. at 447-57.) After Tang became upset, Clossey apologized for offending her and asked if he could explain why he was asking about the credit training. (Guilbert Decl. Ex. 31 (CIT0862-65).) Tang responded by an "abrupt and loud 'No!'" (*Id.*) Perry, Tang's day-to-day supervisor, witnessed the entire exchange. (*Id.*)

On or around May 26, 2011, Tang was placed on a Final Written Warning ("FWW"). (Guilbert Decl. Ex. 32 (CIT0033-39).) The FWW detailed Tang's shortcomings and errors and identified specific areas for improvement, including her ability to communicate, work independently, complete her work in a timely fashion, and understand key financial modeling concepts. (*Id.*) Tang refused to sign the FWW. (*Id.*)

Following her receipt of the FWW, by her own admission, Tang did not attempt to improve her performance. (Tang Dep. at 488-92.) After she continued to make mistakes in violation of her FWW, her employment was terminated on June 24, 2011. (*Id.* at 492-96.)

## ARGUMENT

Though her Complaint is not clear on the point, it appears that Tang contends that she was subjected to sexual harassment in the form of a hostile work environment. To establish such a claim, Tang must establish:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 228 (1st Cir. 2007) (quoting *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002)). All plaintiffs satisfy the first criterion, but Tang has no evidence sufficient to satisfy any of the others.

### A. Tang Cannot Show That She Was Subjected To Harassment of a Sexual Nature.

Neither Title VII nor Massachusetts law imposes a "general civility code" in the workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). And even "harassment," generally speaking – "words and actions 'that, being directed at a specific person, annoy[ ], alarm[ ], or cause[ ] substantial emotional distress in that person and serve[ ] no legitimate purpose'" – are not actionable. *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 138 (1st Cir. 2013). Rather, as the second and third criteria listed above make clear, the harassment must be "sexual" and "based on sex" – that is, directed at the plaintiff because of her gender. *See id.* None of Tang's allegations satisfy those requirements.

Her central claim, that Nackley told her she "makes an ass out of you and me" when she assumes, was said on just a single occasion. The comment, even if made, does not support Tang's claim, because it cannot reasonably be construed as sexual in nature. A person can be an "ass" – in the sense of stubbornness or foolishness – regardless of his or her gender. And Tang alleges no other comment by Nackley to support the idea that he meant the comment in some other, sexual way.

Similarly, the alleged comments about Thai women, if they were made, were limited to a statement that Nackley had two au pairs from Thailand who lived with him and assisted in the care of his family. There is no evidence that Nackley generalized about Thai women or culture, much less that he indicated that his experience with his au pairs had any connection to Tang or to how she should behave in the workplace. The sexual interpretation of Nackley's alleged remarks is entirely the product of Tang's own biases, based on her expressed belief (in the Complaint, no less) that "Thai culture has a very liberal attitude toward sex." Compl. ¶20.

Finally, Nackley's inquiry about a potential conflict of interest, arising from the fact that Tang was dating an executive of a Citizens client for which she may have been asked to review creditworthiness, was not sexual in nature. He was joined on the call by a Human Resources employee for that discussion, and Tang concedes that he said nothing inappropriate in the call. Tang Dep. at 354-61.

Tang's claim accordingly fails at the threshold, and Citizens is entitled to summary judgment.

### B. Tang Cannot Show That The Alleged Harassment, Even If It Occurred, Was Sufficiently Severe or Pervasive To Establish Liability.

Even if Tang had evidence of harassing words or conduct directed at her because of her gender, her claim still would fail because she cannot show that the conduct was "severe or pervasive." The plaintiff's burden on this requirement is to show that "the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). In making that assessment, courts consider such factors as "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance."

*Gerald v. Univ. of P.R.*, 707 F.3d 7, 18 (1st Cir. 2013). Tang does not come close to offering evidence sufficient to meet those criteria.

First, the three matters about which she complains each fall far short of the sort of conduct found to be sufficiently severe in the decided cases. As discussed above, none of the alleged comments was even overtly sexual, or directed at her because of her gender. As an example, with respect to Nackley's inquiry about Tang's boyfriend, the First Circuit has held such comments insufficient even where they explicitly and intentionally arose from a prurient interest in the plaintiff's romantic preferences. In *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 38-39 & n.1 (1st Cir. 2003), the plaintiff's supervisor asked "meddlesome and prying questions about her personal life," made comments about "why [the plaintiff] did not have a husband," including insinuations that perhaps the plaintiff was a lesbian, and a variety of other similar comments. The Court held that the alleged conduct manifested "a disregard for professional courtesy and a penchant for inquiring about the personal affairs of other workers (male or female)," but that such conduct was simply "not the focus of the discrimination laws." *Id*. at 46-47.

Second, even taken together, the three comments on which Tang relies did not so pervade her work environment with gender-based hostility so as to alter the terms of Tang's employment. In *Ponte v. Steelcase Inc.*, 741 F.3d 310 (1st Cir. 2014), for example, the plaintiff's supervisor had driven her home twice after work events, over her objection, put his hand on her shoulder for extended periods during both rides, and propositioned her. The Court acknowledged the sexual nature of the conduct, and that it undoubtedly made the plaintiff "very uncomfortable," but "discomfort is not the test." *Id*. at 320. The requirement is that the sexual conduct be pervasive, and the two events were "not pervasive by any measure." *Id*.; *see also Fontanez-Nunez v.*

*Janssen Ortho LLC*, 447 F.3d 50 (1st Cir. 2006) (finding conduct insufficiently severe or pervasive despite repeated offensive references to the plaintiff concerning his alleged homosexuality); *Katica v. Webster Bank, N.A.*, No. 13-cv-30072-MAP, 2014 WL 3587383 (D. Mass. July 18, 2014) (repeated harassment of plaintiff because she was pregnant rejected as insufficiently severe or pervasive). There is no remotely similar conduct here, nor anything more widespread or pervasive than the conduct rejected as insufficient in *Ponte*. Further, Tang's own conduct demonstrates her lack of concern, as she continued to pursue a transfer to Nackley's group even after he allegedly made comments about Thai women, and sent Nackley an appreciative holiday card even after two of the three comments had been made. More significantly, though she complained generally of "race, gender, and national origin" discrimination in February 2011, she made no mention of harassment or any sexual conduct by Nackley.

### C. Tang's Federal Claim Against Nackley Individually Fails as a Matter of Law.

Title VII does not impose liability on individual employees. *See, e.g., Perez-Cordero v. Wal-Mart Puerto Rico, Inc.*, 656 F.3d 19, 25 n.7 (1st Cir. 2011) (citing *Fantini v. Salem State College*, 557 F.3d 22, 28-31 (1st Cir. 2009)). Tang's federal claims against Nackley individually (and against the "Does 1-10" alleged in her Complaint, who have not been identified) fail as a matter of established law.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant summary judgment for the Defendants on all of Plaintiff's claims and enter judgment in favor of the Defendants.

Dated: June 15, 2015

Respectfully submitted,

CITIZENS BANK
RBS CITIZENS, N.A.
AND
DAVID NACKLEY

By their attorneys,

*/s/ Mark W. Batten*
Mark W. Batten (BBO No. 566211)
PROSKAUER ROSE LLP
One International Place, 22nd Floor
Boston, MA 02110-2600
Tel: (617) 526-9600
Fax: (617) 526-9899
mbatten@proskauer.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on the plaintiff via the Court's CM/ECF system, on this June 15, 2015.

/s/ *Mark W. Batten*
Mark W. Batten