IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| XIAOYAN TANG,<br><br>        Plaintiff,<br><br>v.<br><br>CITIZENS BANK (a/k/a CITIZENS BANK, N.A., a/k/a CITIZENS, N.A. a/k/a CITIZENS, a/k/a RBS CITIZENS, N.A.); RBS CITIZENS, N.A. THE ROYAL BANK OF SCOTLAND GROUP (a/k/a RBS); DAVID M. NACKLEY, and Does 1-10,<br><br>        Defendants. | Civil Action No.: 1:14-cv-12550 |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Civil Rule 56.1, Defendants Citizens Bank, N.A., identified in the First Amended Complaint as "Citizens Bank (a/k/a Citizens Bank, N.A., a/k/a Citizens, N.A. a/k/a Citizens, a/k/a RBS Citizens, N.A.)," RBS Citizens, N.A., and David Nackley (collectively, "Defendants") set forth the following material facts as to which there is no genuine dispute in support of Defendants' Motion for Summary Judgment[1]:

    1.    Plaintiff Xiaoyan "Ivy" Tang was hired by Citizens Bank as a Portfolio Manager II in the Commercial Real Estate Group in October 2007. (*See* Declaration of Joanne M. Guilbert, dated June 15, 2015, ("Guilbert Decl."), Exhibit ("Ex.") 1 (offer letter CIT0001).)

    2.    Initially, Tang reported to Manager Daniel Ouellette. (*Id.*; Declaration of Mark W. Batten, Esq., dated June 15, 2015, Ex. A ("Tang Dep."), 106-107.)

---

[1] The facts set forth herein are assumed to be true and undisputed for the purposes of this Motion for Summary Judgment only.

3. Sometime in or around 2008 or 2009, Ouellette left Citizens Bank and Tang started reporting to Manager Philip Wadleigh. (Tang Dep. 107-108.)

4. Tang's 2009 performance review rated her 2 out of 5, or "Development Required," in one area, and suggested that Tang improve her speed and efficiency, be more proactive in seeking out and completing her work, increase her ability to multitask, and improve her communications with the Relationship Managers whom she supported. (Guilbert Decl. Ex. 2 (CIT0020-23).) Overall she was rated a 3 or "Fully Achieved Objectives." (*Id.*; *see also* Guilbert Decl. Ex. 3 (CIT0918-19).)

5. Within weeks of receiving the 2009 performance review, Tang sought a transfer within Citizens Bank to an open position in the Technology Banking Group. (Tang Dep. at 157-58.)

6. In response to her request for the transfer, Tang received a phone call from Manager David Nackley, to whom she would report in the Technology Banking Group if she successfully transferred. (*Id*. at 159.)

7. Nackley worked out of the Stamford, Connecticut office and came to Boston once every one to two weeks to oversee the Technology Banking Group staff based there. (*Id*. at 162, 248.)

8. Tang and Nackley arranged to meet at a restaurant in Faneuil Hall, which was close to Citizens Bank's offices in Boston where Tang worked, to discuss the possibility of Tang's transfer. (*Id*. at 160-61; Declaration of David Nackley, dated June 15, 2015 ("Nackley Decl."), ¶ 9.)

9. Tang brought work samples with her to the meeting, and Nackley told her that he would review them. (Tang Dep. at 170-71.)

10. Nackley was primarily interested in learning why Tang wanted to leave the Commercial Banking Group, which was faring relatively well in the aftermath of the financial crisis, and although he had some difficulty communicating with Tang due to her English skills, he understood that she had an interest in technology and technology companies. (Nackley Decl., ¶¶ 7-8.)

11. Tang alleged that at the Faneuil Hall meeting, Nackley told him about two au pairs who helped take care of his family, and the fact that they were both from Thailand. (Tang Dep. at 175, 184-85.) Tang interpreted Nackley's remarks about his au pairs as meaning that she must "get with his mandated, in effect, program of sex." (*See* First Amended Complaint ("Compl."), Dkt. No. 1-1 at ¶¶ 20-21; Tang Dep. at 175.)

12. Tang has repeatedly referred to Nackley's au pairs as his "Thai girls" or "Thai house girls." (Compl. ¶ 20; Tang Dep. at 171, 175, 180, 184, 186.)[2]

13. Tang also complained more generally that Nackley spoke about "Asian women," although she did not provide any specifics beyond Nackley's sharing that his family hosted au pairs who were originally from Thailand. (Tang Dep. at 173-175.) She has alleged that Nackley made remarks to the effect that "Asian women are obedient," but when asked for detail in her deposition, Tang replied that she could not "recall details," but that "in sense he say Asian women are obedient" when he spoke about his Thai au pairs by saying that they took care of his home and lived with his family. (*Id*. at 175.)

14. Finally Tang alleges that Nackley asked her if she was married and, when she said no, he said something about "where to find a boyfriend." (Tang Dep. at 176-80.) Once again,

---

[2] Tang also alleges that Nackley made certain statements about the au pairs who worked in his home at some unspecified time during or after this meeting: (1) he remarked that the au pairs who worked with his family wore very modest bathing suits when they went to the pool, (Tang Dep. at 270-71), and (2) he mentioned that he had played a role in sponsoring them, for immigration purposes, to come to the U.S. and work as au pairs (*id*. at 218-20).

when asked to provide specific detail about what Nackley actually said and how she responded, Tang testified that she told Nackley that her dating life was her business, and that she could not recall how he responded to that. (*Id.*)

15. At the time of the Faneuil Hall meeting, Tang was dating Mark Akin, an executive at Invention Machine, a company that was a client of the Technology Banking Group. (Tang Dep. at 37-38.)

16. Tang did not mention the meeting or her alleged reaction to the meeting to anyone else, and she continued to pursue the transfer even after her meeting with Nackley in Faneuil Hall. (*Id.* at 191-94.)

17. Following her meeting with Nackley, with full knowledge that she would be reporting to him if she transferred to the Technology Banking Group, Tang continued to pursue to the intra-company transfer. (*Id.* at 193.) She exchanged emails with Nackley, none of which were alleged to be inappropriate or offensive, and proceeded to interview with several senior staff members in the Technology Banking Group. (*Id.* at 187-88.)

18. Tang's current manager, Philip Wadleigh, and Human Resources Business Partner Lori Eldridge expressed hesitation about the transfer due to Tang's poor performance in the Commercial Real Estate Group. (Guilbert Decl., Ex. 3 (CIT 0918-919).) Indeed, in an email to Eldridge notifying her of the potential transfer, Wadleigh wrote that Tang's performance grade was a possible obstacle to the transfer, particularly because she had initially been rated as a "2" for 2009, and her performance rating was later rounded up to a "3." (*Id.*)

19. Tang's requested transfer was ultimately approved. (Tang Dep. at 202-204.) It was viewed as an opportunity for Tang to get a "fresh start." (Guilbert Decl. Ex 4 (CIT1079-80).)

20. Sometime in or around July 2010, Nackley met with Tang to discuss her performance goals for the upcoming year. (Tang Dep. at 213-14.)

21. During that meeting, which lasted less than 10 minutes, Nackley provided Tang with a list of performance goals for the 2010 performance year. (Guilbert Decl. Ex. 5 (CIT0010); Nackley Decl. ¶ 11.) In addition to the typed goals that were provided to all Portfolio Managers, Nackley handwrote additional goals and comments for Tang, including the goals that she (1) work independently; (2) improve communication, including that she not "assume" things and instead should ask questions; and (3) use Senior Portfolio Manager Jennifer Perry, who functioned as Tang's day-to-day supervisor in the Boston office, as an information resource. (Guilbert Decl. Ex. 5 (CIT0010).)

22. According to Tang, Nackley broke the word "assume" down into "ass," "u" and "me," suggesting that Tang could avoid making incorrect assumptions by remembering that when she make assumptions without asking clarifying questions, she makes an "ass" out of "[yo]u" and "me." (*Id*.; Tang Dep. at 221-25.) Tang interpreted Nackley's remarks as having a sexual meaning. (Tang Dep. at 221-25.)

23. During her deposition, Tang testified that, following this conversation, she believed that Nackley wanted to have a sexual relationship with her. (*Id*. at 258.) She also testified, however, that Nackley never said anything overtly sexual to her. (*Id*. at 259.) She simply concluded as much from her conversation with Nackley regarding the word "assume." (*Id*. at 258.)

24. On December 24, 2010, Tang gave Nackley a holiday card saying, among other kind words, that "[i]t has been great being part of your team. Thank you for all your support!" (Guilbert Decl. Ex. 6 (CIT1083-84).)

25. During her deposition, Tang refused to answer questions regarding whether her statements in the holiday card were honest or truthful. (Tang Dep. at 291-92.)

26. Nackley and other staff members in the Technology Banking Group continued to provide Tang with constructive feedback and coaching, particularly with regard to her communication skills and ability to work independently. (*See*, *e.g.*, Guilbert Decl. Exs. 4, 7 – 13 (CIT1079-80; CIT0526; CIT0603-04; CIT645-46; CIT763-64; CIT0823; CIT924; CIT1059-60); Nackley Decl. ¶¶ 15-17.)

27. In January 2011, Tang received her 2010 performance evaluation, which provided her with an overall annual rating of 2 out of 5, or "Development Required." (Guilbert Decl. Ex. 14 (CIT0028-30).) Nackley identified several areas in which Tang needed to improve, including her ability to work independently and her communication skills. (*Id.*) Tang wrote in the "employee comments" section of her review that she "appreciate[d] the constructive advice with respect to [her] performance" and that she "look[ed] forward to utilizing it in the coming year." (*Id.*)

28. On January 31 and February 4, after receiving her review, Tang emailed Nackley to tell him that she wished to improve her performance and that she hoped he could "continue to trust" in her. (Guilbert Decl. Exs. 15 & 16 (CIT0334 and CIT0292).)

29. Nackley worked with Citizens Bank's Employee Relations Service Center ("ERSC") to draft a Performance Improvement Plan ("PIP") for Tang, which was delivered to Tang on or around February 8, 2011. (Guilbert Decl. Ex. 17 (CIT0031-32).)

30. Around the same time, Perry told Nackley that Tang had disclosed to her that she was or had been dating Mark Akin, a top management executive of a company that was one of Relationship Manager Will Clossey's clients. (Tang Dep. at 354-61; Nackley Decl., ¶ 20.)

31. Because the Technology Banking Group was responsible for evaluating the creditworthiness of certain businesses applying for financing at Citizens Bank, this created a potentially serious conflict of interest. (Tang Dep. at 360-61; Guilbert Decl. Exs. 18 & 19 (CIT0473 and CIT1010-11); Nackley Dep., ¶¶ 20, 23.)

32. Accordingly, during his February 8 meeting with Tang to address her performance shortcomings, Nackley also sought to address the potential conflict of interest. (Guilbert Decl. Ex. 19 (CIT1010-11).) When the conversation turned to the possible conflict of interest, a Human Resources Business Partner joined the meeting via telephone. (*Id*. at 356-57.) Tang said very little during this meeting and did not appear outwardly emotional, but she testified that she was "so scared," and felt "mentally totally like crushed" by the meeting. (Tang Dep. at 355-56; Nackley Decl., ¶ 24.)

33. Tang does not allege that Nackley made any sexual or discriminatory remarks during this meeting. (*Id*. at 354-61.)

34. Tang refused to sign the PIP during the February 8 meeting. (Tang Dep. at 362-63.) On February 14, 2011, she returned the PIP with a handwritten note reading: "I disagree with the Performance Improvement Plan. I felt the plan is the result of discriminatory treatment based on my race, gender, and national origin." (Guilbert Decl. Ex. 17 (CIT0031-32).) On the same day, Tang also called ERSC to reiterate the same allegations. (Tang Dep. at 364.)

35. After complaining to ERSC, Tang was promptly contacted by ERSC Consultant Breeda Cosgrove. (*Id*. at 368.) In response to Cosgrove's request for more information about Tang's concerns, Tang provided her with a letter dated February 27, 2011. (Guilbert Decl. Ex. 20 (CIT0012-13).) For the first time, Tang complained that Nackley's "present performance review" was "itself evidence of discrimination" because it followed "inappropriate words to

[her]," specially Nackley's "dwell[ing]" on "the word 'assume,' emphasizing that it could be broken down into 'ass,' 'you(u)' and 'me.'" (*Id*.) In her letter, Tang once again requested a transfer within the bank. (*Id*.)

36. After receiving Tang's February 27, 2011 letter, Cosgrove contacted Tang to request a meeting to discuss her allegations. (Tang Dep. at 379-380.) Tang refused to meet with Cosgrove, and insisted that all communications remain in writing. (*Id*.; Guilbert Decl. Ex. 21 (CIT0179-80).) Cosgrove informed Tang that an in-person meeting was a necessary component of her investigation, and that if Tang would not meet with her, then she would have to proceed with the investigation without the benefit of Tang's input. (Guilbert Decl. Ex. 22 (CIT0081-82).) Tang continued to refuse to meet with her. (Tang Dep. at 381.)

37. Cosgrove investigated Tang's allegations of race, gender, and national origin discrimination, including interviews with Tang's colleagues. (Guilbert Decl. Ex. 23 (CIT0042).) Ultimately, Tang's allegations were determined to be unsubstantiated. (*Id*.)

38. In addition, Cosgrove reviewed the documentation of Tang's performance issues, and found Tang's performance reviews to be justified by her work product and feedback from her supervisors. (*Id*.) In or around late March or early April 2011, Cosgrove advised Tang that the case was closed as unsubstantiated, but that the case could be reopened if Tang wished to participate in the investigation and provide additional information. (*Id*.)

39. Following her placement on the PIP on February 8, 2011, Tang's performance did not improve and she continued to make material errors, despite continuous coaching. (*See*, *e.g.*, Guilbert Decl. Exs. 24 – 29 (CIT0235-36; CIT0285; CIT0786; CIT0474-76; CIT0548; CIT1006-07); Nackley Decl. ¶ 24.)

40. In early May, Tang made mistakes in a debt service analysis that she was preparing for one of Clossey's clients. (Guilbert Decl. Ex. 31 (CIT0862-65).) Clossey spoke with her about the mistakes and explained how to prepare an accurate analysis. (*Id*.) Tang indicated that she understood and that she would correct the model. (*Id*.)

41. Several days later, Tang provided Clossey with work product that contained the same mistakes. (*Id*.) Clossey asked to meet with Tang on May 12 to discuss the work product. (*Id*.) He again went over the appropriate way to prepare the analysis. (*Id*.) Tang told Clossey that she felt that he was incorrect about how to do the analysis. (*Id*.) In response to Tang's mistaken understanding of the analysis, Clossey asked her if she had taken the bank's credit training program. (*Id*.)

42. Tang became upset in response to Clossey's inquiry. (*Id*.) She raised her voice, told Clossey that he was "very mean" and said that she had been told she did not need credit training. (*Id*.; Tang Dep. at 447-57.) After Tang became upset, Clossey apologized for offending her and asked if he could explain why he was asking about the credit training. (Guilbert Decl. Ex. 31 (CIT0862-65).) Tang responded by an "abrupt and loud 'No!'" (*Id*.) Perry, Tang's day-to-day supervisor, witnessed the entire exchange. (*Id*.)

43. On or around May 26, 2011, Tang was placed on a Final Written Warning ("FWW"). (Guilbert Decl. Ex. 32 (CIT0033-39).) The FWW detailed Tang's shortcomings and errors and identified specific areas for improvement, including her ability to communicate, work independently, complete her work in a timely fashion, and understand key financial modeling concepts. (*Id*.) Tang refused to sign the FWW. (*Id*.)

44. Following her receipt of the FWW, by her own admission, Tang did not attempt to improve her performance. (Tang Dep. at 488-92.)

45. After she continued to make mistakes in violation of her FWW, her employment was terminated on June 24, 2011. (*Id.* at 492-96.)

Dated: June 15, 2015

Respectfully submitted,

CITIZENS BANK
RBS CITIZENS, N.A.
AND
DAVID NACKLEY

By their attorneys,

*/s/ Mark W. Batten*
Mark W. Batten (BBO No. 566211)
PROSKAUER ROSE LLP
One International Place, 22nd Floor
Boston, MA 02110-2600
Tel: (617) 526-9600
Fax: (617) 526-9899
mbatten@proskauer.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on the plaintiff via the Court's CM/ECF system, on June 15, 2015.

/s/ *Mark W. Batten*
Mark W. Batten