UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| XIAOYAN TANG,<br><br>      Plaintiff,<br><br>v.<br><br>CITIZENS BANK (a/k/a CITIZENS BANK, N.A., a/k/a CITIZENS, N.A. a/k/a CITIZENS, a/k/a RBS CITIZENS, N.A.); RBS CITIZENS, N.A. THE ROYAL BANK OF SCOTLAND GROUP (a/k/a RBS); DAVID M. NACKLEY, and Does 1-10,<br><br>      Defendants. | Civil Action No.: 1:14-cv-12550 |

## **DECLARATION OF DAVID NACKLEY**

I, David Nackley, hereby declare and state the following true facts:

1. I am of legal age and competent to make this declaration. I have personal knowledge of the facts set forth in this declaration.

2. From 2007 until 2014, I worked as a Senior Vice President for the Technology Bank Group at Citizens Bank, N.A.

3. My office was in Stamford, Connecticut, but I was responsible for teams in other offices as well, including a team in Boston, Massachusetts. I would visit Boston once every one or two weeks. I did not maintain an office in Boston.

4. I left Citizens Bank voluntarily to pursue the job I now have.

5. In 2009 and 2010, due to the financial crisis and its aftermath, there was a hiring slowdown in the banking industry.

6. My group, the Technology Banking Group, fared relatively well during the crisis.

7. As a result, my group had a need for additional Portfolio Managers at a time when it was difficult to identify and secure new hires. We had previously identified at least one internal candidate within Citizens Bank who went on to become a successful Portfolio Manager.

8. Due to the success of the prior internal transfer, when I was told that Ivy Tang, a Portfolio Manager in the Commercial Real Estate group, was interested in transferring to the Technology Banking Group, I was interested in learning more.

9. I met Ivy Tang for lunch in Faneuil Hall to discuss her interest in transferring to the Technology Banking Group. My questions for Ms. Tang focused primarily on why she wanted to leave the Commercial Real Estate Group. That group was among the most successful during the financial crisis, and I was surprised to learn that someone wanted to leave.

10. Our conversation during lunch was entirely professional. I had some difficulty communicating with Ms. Tang, due to her English skills, but I understood that Ms. Tang had an interest in technology and technology companies, and that that was why she wanted to transfer groups.

11. Ms. Tang joined the Technology Banking Group as a Portfolio Manager II sometime in the middle of 2010. At first, her performance was poor, particularly with regard to communication and efficiency, but that is not unusual for employees who are brand new to the Technology Banking Group.

12. Ms. Tang worked mostly with Senior Portfolio Manager Jennifer Perry, who acted as her day-to-day manager, and Relationship Manager Will Clossey, both of whom were based in the Boston office.

13. Shortly after Ms. Tang joined the Technology Banking Group, I met with each Portfolio Manager to provide them with a list of goals for the 2010 performance year. Each meeting, including my meeting with Ms. Tang, lasted approximately ten minutes or less.

14. During that meeting, I went over each of the Portfolio Manager goals, which were necessarily the same for all Portfolio Managers so they could be evaluated fairly, and I identified some specific areas where I thought Ms. Tang should focus her efforts for improvement.

15. I encouraged Ms. Tang to make sure that she was communicating with everyone, and to always ask questions rather than making assumptions. I also asked her how she was settling into her new position. She replied that she had settled in well.

16. I clarified to Ms. Tang that Ms. Perry was her day-to-day manager, and that she should use Ms. Perry as an information resource whenever she had questions.

17. Ms. Tang's performance continued to be poor. Ms. Perry and Mr. Clossey informed me that Ms. Tang was slow to complete assignments, often made mistakes, and was difficult to communicate with.

18. As I prepared Ms. Tang's annual performance evaluation for the 2010 year, I concluded that she might benefit from being placed on a performance improvement plan ("PIP") to help her understand the specific areas in which she must improve in order to be successful as a Portfolio Manager II in the Technology Banking Group. I discussed the possibility of a PIP with Ms. Perry, and she agreed that it would be valuable to address Ms. Tang's performance problems directly through a PIP. Accordingly, I started working with Citizens Bank's Employee Relations Service Center ("ERSC") to prepare a PIP for Ms. Tang.

19. Based on feedback from Ms. Perry, Mr. Clossey, and other employees for whom Ms. Tang worked, as well as my own observations and evaluations of her performance, I rated Ms. Tang as a "2" out of "5" for 2010, or "Development Required."

20. Sometime in January 2011, Ms. Perry informed me that Ms. Tang had told her that she was or had been dating a top management executive of one of Mr. Clossey's clients. We agreed that this created the potential for a serious conflict of interest.

21. I met with Ms. Tang on or around February 8, 2011 to deliver the PIP.

22. Ms. Tang refused to acknowledge or sign the PIP during the meeting.

23. Sometime approximately a week or ten days after the February 8 meeting, I met with Ms. Tang to discuss the potential conflict of interest. An ERSC representative joined the meeting via phone to help explain why the possible conflict of issue needed to be addressed. Ms. Tang could not comprehend why she was being asked about her relationship, and we repeatedly explained that it was solely for the purpose of preventing or eliminating any conflict of interest and protecting the integrity of the bank's business.

24. During this meeting, Ms. Tang said very little and did not seem emotional. She did not raise her voice, nor did anyone else in the meeting.

25. On or around February 14, 2011, Ms. Tang returned the PIP with a handwritten note that she felt the PIP was the result of discrimination on the basis of race, gender, and national origin. ERSC conducted a full investigation into Ms. Tang's claims and concluded that they were unsubstantiated.

26. Ms. Tang continued to perform poorly. I repeatedly received feedback from Ms. Perry, Mr. Clossey, and others that she was difficult to work and communicate with, ignored instructions, and made material errors.

27. Ms. Tang was placed on a Final Written Warning "FWW" on May 26, 2011. Sometime in or around mid-June, Ms. Perry informed me that Ms. Tang had made a material mistake in violation of her FWW.

28. Ms. Tang's employment was terminated on June 24, 2011. My boss, Executive Vice President Robert Rubino, informed her of her termination.

29. After Ms. Tang left Citizens Bank, I did not have any further communication or interaction with her.

30. Before signing below, I reviewed the contents of this statement and confirmed that it was completely accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 15 day of June, 2015.

David Nackley